UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZAVIER PIGUES,<br><br>    Plaintiff,<br><br>    v.<br><br>SOLANO COUNTY JAIL, et al.,<br><br>    Defendants. | No. 2:15-cv-1004 KJM DB P<br><br>FINDINGS AND RECOMMENDATIONS |

   Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. §1983.

   This matter is before the court on the defendants' motion for summary judgment, which plaintiff opposes. For the reasons set forth here, defendants' motion will be granted.

**I.    Procedural History**

   Plaintiff initiated this action on May 8, 2015, by filing a complaint against the Solano County Jail, Sergeant Sands, and Officers Pimentel and Avila. The complaint was screened on January 11, 2016, and found to state a Fourteenth Amendment Equal Protection claim and a First Amendment Free Exercise claim against defendants Officers Pimentel and Avila. (ECF No. 9.) The defendants filed an answer on February 26, 2016 (ECF No. 15), and a discovery and scheduling order issued thereafter (ECF No. 20.)

   On July 14, 2016, defendants filed the instant motion for summary judgment. (ECF No.

1

21.) Defendants move for dismissal on the ground that there is no evidence to support plaintiff's claims. Alternatively, they argue that they are entitled to qualified immunity.

Plaintiff filed an opposition on August 22, 2016[1] (ECF No. 25), and defendants have filed a reply (ECF No. 27).

This matter is fully briefed and ready for disposition.

## II.     Plaintiff's Allegations

Plaintiff is African-American. On March 6, 2015, while plaintiff was housed at Solano County Jail, Gang Unit Officers Pimentel and Avila conducted strip and cell searches only of African-American inmates in violation of their equal protection rights. During the search of plaintiff's cell, Officers Pimentel and Avila confiscated a book that plaintiff was writing and all of plaintiff's drawings. Plaintiff claims that his drawings are central to his religious beliefs. His book was eventually returned, but his drawings were not.

## III.    Legal Standards

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the

---

[1] Although Local Rule 260(b) directs any party opposing a motion for summary judgment to "reproduce the itemized facts in the [moving party's] Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed," plaintiff has not complied with this requirement in that he has neither responded to defendants' Statement of Undisputed Facts nor submitted his own Statement of Disputed Facts. See E.D. Cal. Local Rule 260(b).

fact." Fed. R. Civ. P. 56(c)(1). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. Summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 447 U.S. at 248.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475

U.S. at 587 (citation and internal quotation marks omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

**IV.    Undisputed Facts[2]**

Plaintiff is African-American and a Jehovah's Witness. Pl.'s Opp'n at 2. At all times relevant to this action, plaintiff was housed at Solano County Jail in Solano, California, in the D Module. Defendants Pimentel and Avila were assigned as gang unit officers.

**A.    Gang Activity and Institutional Security**

Prison gangs pose a serious threat to the security of jails and prisons in California. Defs.' Statement of Undisputed Facts ("DSUF") ¶¶ 1-3. Inmates are thus prohibited from knowingly promoting, furthering, or assisting a prison gang. Id. ¶ 4. Jail officials are proactive in limiting the engagement of inmates in gang-related activity in order to prevent gang-related violence and crimes before they occur. See id. ¶¶ 5-6.

The core function of jail administration is to maintain safety and security. DSUF ¶ 7. Critical to this goal is prohibiting gang activity, which includes recruiting new members and associates, maintaining individual credibility by demonstrating allegiance to the gang and instilling fear into other inmates, electing gang leadings, disciplining other inmates through violence and killings, drug trafficking, extortion, fundraising, and coordinating other illegal

---

[2] All facts are undisputed unless noted otherwise.

4

activities. Id. ¶¶ 8-9.

The identification of prison gang activity is an evolving process wherein information is gathered through ongoing investigations, monitoring known gang members and associates, and confiscating items that contain gang symbols and coded messages. DSUF ¶¶ 10-11. This process enables gang investigators to identify and decipher new codes, symbols, and messages as they are developed. Id. ¶ 12.

Every prison gang uses distinctive markers by which members and associates identify themselves as affiliated with the gang. DSUF ¶ 14. These markers may include body markings, tattoos, hand signs, types or colors of clothing, drawings, and symbols. Id. ¶ 15. A gang member's use of these symbols announces allegiance and fealty to the gang and encourages others to affirm their own loyalty. Id. ¶ 16. Because inmate activities are closely monitored for evidence of gang activity, gang members often use coded messages hidden in the text of letters, in drawings, or in photos to communicate with other members. Id. ¶ 17.

One gang with a presence in California's jails and prisons is known as Kumi 415. DSUF ¶ 18. Its membership is largely composed of African-Americans. Id. ¶ 19. "Kumi" is the Swahili word for the number 10, and "415" is the area code for San Francisco, which is from where many of the gang's members come. DSUF ¶¶ 20, 22. Kumi 415 has been known to act as a recruiter for another dangerous prison gang known as the Black Guerrilla Family. Id. ¶ 23.

Kumi 415's drawings and tattoos often incorporate African symbols. DSUF ¶ 24. One of the most common depictions is of a black man rising up from Africa. Id. ¶ 25.

**B.     Cell and Inmate Searches**

Solano County Jail policies require that random cell searches be performed on all three daily shifts. DSUF ¶ 26. The cells are to be chosen at random with every cell in the facility to be searched at least once per week. Id. ¶ 27.

When an incident takes place in the jail that involves that safety and security of the institution, such as the location of drugs and weapons or information that an inmate is involved in a gang, the jail's gang unit is brought in to investigate due to the possibility of gang involvement. DSUF ¶¶ 27-28. After such events, the standard procedure is for the gang unit to search the cells

5

of any inmates involved as well as the inmates who occupy those cells. Id. ¶ 30.

When searching a cell as part of an investigation, staff from the gang until will never search just one cell because information, including evidence, will quickly get around the housing unit following the incident. DSUF ¶¶ 36-37. For this reason, the gang unit will always randomly select at least one other cell in the unit to also search. Id. ¶ 38.

### C.  The March 6, 2015, Incident

The D Module contains 14 cells capable of housing 28 inmates of various races. DSUF ¶ 41. On March 6, 2015, only 19 inmates were housed in the D Module, six of whom were African-American. Id. ¶ 42. These six inmates were housed in four different cells, with two of the inmates housed without a cellmate. Id. ¶ 43.

On the day at issue, defendants entered the D Module to search the cell of two African-American inmates after they received information from an officer indicating that these two inmates may be involved in a gang. DSUF ¶ 39. An officer had seen that these two inmates had tattoos that were associated with the Black Guerilla Family. Id. ¶ 40. These inmates' cell was located on the second floor. Pl.'s Dep. at 11:2-7.

Plaintiff and his cellmate were housed in the D Module on the first floor in a cell near the one that the defendants intended to search. DSUF ¶ 46; Pl.'s Dep. at 11:5-7. Plaintiff's cell was therefore also selected randomly for a search. DSUF ¶ 46. These four African-American inmates were removed from their cells and placed on the yard so that the searches could be conducted. Id. ¶ 47. When plaintiff asked why he was being searched, defendant Pimentel responded, "This is just part of being in jail." Pl.'s Dep. at 20:16-18.

During the course of the search of plaintiff's cell, defendants confiscated a book plaintiff was writing and some drawings. Plaintiff understands that materials confiscated by the gang unit are examined to see if there is any gang affiliation. Pl.'s Dep. at 28:8-11.

The book confiscated by the defendants was a work of fiction about the lifestyle that plaintiff grew up around. Pl.'s Dep. at 26:10-16. This book did not have religious significance. Id. at 28:19-20. The book was returned to plaintiff shortly after it was confiscated. Id. at 30:2-5.

The drawings that defendants confiscated were drawn by other inmates. Pl.'s Dep. at

31:11-19. Plaintiff contends that, as a Jehovah's Witness, he is "encouraged to imitate the faith of those who came before [him]." Pl's Opp'n at 2. Two of the drawings were drawn to "create imitations of Daniel in the lion's den." Id. They depicted an angel with outspread arms and wings with two lions, and plaintiff was drawn sitting in the middle of the two lions on the floor. Pl.'s Dep. at 33:1-5, 36:4-7. These drawings were intended "to help [plaintiff] get through [his] time … based on [his] religion that [he] believed in." Id. at 35:2-5. These drawings were never returned to plaintiff. Pl.'s Dep. at 37:21-22.

Defendants interpreted these drawings as depicting a winged man, possibly African-American, above another man with dreadlocks wearing a baseball cap with what appeared to be a San Francisco 49ers logo on it. DSUF ¶¶ 55-56. Also included in the pic were two "male African lions." Id. Defendants confiscated the drawings because they believed it to be similar to those of the Kumi 415 gang because they contained African symbols and appeared to depict a black man rising up from Africa. DSUF ¶ 60.

After plaintiff's cell was searched, defendants conducted a search of plaintiff's body. DSUF ¶ 73. They took photographs of plaintiff's face and of a panther tattoo on his body. DSUF ¶ 75.

Though plaintiff has not attended religious services with regularity, he reads the Bible every day and studies it for two hours on Sundays. Pl.'s Dep. at 41:5-25, 43:15-16. He also reads various types of religious literature mailed to him, and he communicates with the jail's chaplain. DSUF ¶¶ 85-86.

Plaintiff was never told by any staff person at the jail that he could not have drawings made by other inmates. Pl.'s Dep. at 40:4-9.

### V.   Discussion

####    A.   Fourteenth Amendment Equal Protection

The Equal Protection Clause requires that persons who are similarly situated be treated alike. City of Cleburne, Tex. v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). An equal protection claim may be established by showing that the defendant intentionally discriminated against the plaintiff based on the plaintiff's membership in a protected class, Serrano v. Francis,

1  345 F.3d 1071, 1082 (9th Cir. 2003), Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir.
2  2001), or that similarly situated individuals were intentionally treated differently without a
3  rational relationship to a legitimate state purpose, Village of Willowbrook v. Olech, 528 U.S. 562,
4  564 (2000); see also Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 592 (9th Cir. 2008); North
5  Pacifica LLC v. City of Pacifica, 526 F.3d 478, 486 (9th Cir. 2008).

6  Defendants have submitted evidence establishing that two of the four cells housing
7  African-American inmates were searched, that four of the six African-American inmates were
8  searched, and that the selection of plaintiff's cell was random. Plaintiff has not submitted any
9  evidence to suggest that the decision to search his cell was on account of his race or that the cell
10 searches were not reasonably related to legitimate penological interests. Absent such evidence,
11 summary judgment must be entered for defendants.

12  **B.   First Amendment Free Exercise**

13  The First Amendment to the United States Constitution provides that "Congress shall
14 make no law respecting the establishment of religion, or prohibiting the free exercise thereof ..."
15 U.S. Const. amend. I. Prisoners "retain protections afforded by the First Amendment," including
16 the free exercise of religion. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). However,
17 "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges
18 and rights, a retraction justified by the considerations underlying our penal system.'" Id. (quoting
19 Price v. Johnson, 334 U.S. 266, 285 (1948)).

20  The protections of the Free Exercise Clause are triggered when prison officials
21 substantially burden the practice of an inmate's religion by preventing him from engaging in
22 conduct which he sincerely believes is consistent with his faith. Shakur v. Schriro, 514 F.3d 878,
23 884-85 (9th Cir. 2008); Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997), overruled in part
24 by Shakur, 514 F.3d at 884-85. "In order to establish a free exercise violation, [a prisoner] must
25 show the defendants burdened the practice of his religion, by preventing him from engaging in
26 conduct mandated by his faith, without any justification reasonably related to legitimate
27 penological interests." Freeman v. Arpaio, 125 F.3d 732, 736 (9th Cir. 1997). "In order to reach
28 the level of a constitutional violation, the interference with one's practice of religion 'must be

8

more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.'" Freeman, 125 F.3d at 737 (quoting Graham v. C.I.R., 822 F.2d 844, 851 (9th Cir. 1987)).

"[I]ndirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment." Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 450-51 (1988). However, "[t]his does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions." Id. A free exercise violation occurs where a burden imposes more than an inconvenience on religious exercise. See Guru Nanak Sikh Soc'y, 456 F.3d at 988; Warsoldier, 418 F.3d at 995-96.

Plaintiff has failed to establish a dispute of material fact regarding this claim. The record establishes that defendants confiscated certain books and drawings from plaintiff's cell and that only two of the confiscated drawings are religiously significant to plaintiff. There are no facts, however, to suggest that the confiscation of these drawings burdened plaintiff's practice of his religion or amounted to anything more than an inconvenience or isolated incident. Indeed, plaintiff admits that he reads the Bible daily and studies the Bible for two hours on Sundays, he receives religious literature in the mail, and he communicates with the jail chaplain. He also admits that he has never been informed that he cannot procure new drawings. In addition, there are no facts undermining defendants' claim that the confiscation of these drawings was justified to investigate their significance to suspected gang activity. The court thus concludes that no reasonable trier of fact would find that the defendants violated plaintiff's free exercise of his religion. Accordingly, defendants' motion for summary judgment must also be granted on this claim.

**VI.   Conclusion**

Based on the foregoing, IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment be granted and this action be dismissed.

1  These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  December 21, 2016

*[signature]*
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

/DLB7;

DB/Inbox/Substantive/pigu1004.msj